[Cite as *Cleveland v. Scott*, 2019-Ohio-5244.]

## COURT OF APPEALS OF OHIO

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| CITY OF CLEVELAND, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 108305 |
| v. | : | |
| DEZMOND SCOTT, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** December 19, 2019

Criminal Appeal from the Cleveland Municipal Court
Case No. 2018CRB019685

*Appearances:*

Barbara A. Langhenry, Cleveland Director of Law, and Thomas A. Fisher, Assistant Prosecuting Attorney, *for appellee.*

Mate Rimac, *for appellant.*

MARY J. BOYLE, P.J.:

{¶ 1} Defendant-appellant, Dezmond Scott, ("Scott"), appeals his conviction for menacing by stalking. He raises two assignments of error for our review:

1. Insufficient evidence supported the trial court's finding of guilty for menacing by stalking.

2. The manifest weight of the evidence did not support appellant's conviction of menacing by stalking.

{¶ 2} Finding no merit to his assignments of error, we affirm.

## I.      Procedural History and Factual Background

{¶ 3} On November 1, 2018, the city of Cleveland filed a complaint against Scott, charging him with one count of menacing by stalking in violation of R.C. 2903.211(A), a misdemeanor of the first degree.

{¶ 4} On November 29, 2018, Scott pleaded not guilty to the charge, and the case proceeded to a bench trial on January 29, 2019, during which the following evidence was presented.

{¶ 5} N.L. and Scott, who are not married, have a one-year-old child together and have shared parenting. According to N.L. and Scott, the shared parenting plan provided that Scott would have visitation with their daughter every other week on either Monday, Tuesday, and Wednesday or on Friday, Saturday, and Sunday. Scott testified that he never has visitation on Thursdays.

{¶ 6} On Thursday, October 25, 2018, N.L. was working at the Subway on Clark Avenue in Cleveland, Ohio. She dropped her daughter off at her niece's house prior to work. N.L. stated that Scott called her "a bunch of times" that morning and when she told him that their daughter was with N.L.'s niece, Scott said he did not give N.L. permission to leave their daughter with the niece and that N.L. needed his permission to do so. Later, around 10 a.m. that same day, Scott showed up at

Subway and demanded to see his daughter. N.L. said that Scott came in, started an argument, ordered food, sat down, and then continued to argue with her. N.L. testified that Scott told her that he was going to take their daughter away from N.L. and that Scott was going to bring his new girlfriend to N.L.'s house to "squash whatever beef [they had]." N.L. said that Scott "just kept going, talking about what he was [going to] do, how he was [going to] do it, and sitting there, just, steadily, laughing, like everything's a joke." N.L. stated it was not the first time Scott threatened to take their daughter away from her. N.L. stated that Scott never physically threatened her or their daughter, but he threatened that his new girlfriend would "beat up" N.L. N.L. testified that the incident caused her mental distress, saying, "I couldn't think to work that rest of that day."

{¶ 7} Scott testified that he and N.L. had "no issues" on October 25, and denied saying that his new girlfriend would "beat her up."

{¶ 8} That afternoon, Scott showed up at N.L.'s house with his girlfriend around 5 p.m. N.L. explained that she was trying to pull out of her driveway to go pick up their daughter from daycare. According to N.L., Scott pulled into the driveway and refused to let N.L. leave. She said that she tried to go around him through her neighbor's driveway, but that Scott "kept pursuing to push up into the driveway, to where I could not get around him." Eventually, Scott let N.L. leave. When asked why Scott came to her house that day, N.L. testified that Scott said he wanted to see their daughter, but said "it wasn't even his visitation day[,]" since it was a Thursday.

{¶ 9} Scott testified that he went to N.L.'s house because N.L. told him to come and get their daughter. He said N.L. refused to let Scott see their daughter because Scott's girlfriend was there. He admitted that he did not have visitation that day.

{¶ 10} On October 27, 2018, Scott called N.L. 13 times and texted her 22 times about their daughter. According to Scott, N.L.'s manager at Subway called him and told him to stop contacting N.L. and said she would be contacting the police. Scott showed up at Subway around 11 a.m., walked in laughing, and told N.L. that he was allowed to be there because she was the mother of his child. N.L. testified that Scott "came in talking about he was allowed to ask questions about his daughter and that's what [he was there] to do." The police arrived around the same time as Scott, and the police escorted Scott out of the Subway and told him not to return to the location, but they did not arrest Scott. N.L. said that that incident caused her mental distress and that she was unable to finish her shift and went home. On cross-examination, N.L. stated that Scott was calling and harassing her because he was not getting his way and she was not giving him what he wanted.

{¶ 11} Scott testified that he went to the Subway on October 27, to explain to the police his side of the story and explain that he was entitled to visitation that day.

{¶ 12} The trial court found Scott guilty of menacing by stalking. The trial court sentenced Scott to serve 180 days in jail, but suspended the 180 days; serve three years of probation; pay a $100 fine as well as court costs; complete an alcohol and drug assessment and follow the recommendations; and complete random urine

screens, the Domestic Intervention Education Training program, and parenting classes.

{¶ 13} It is from this judgment that Scott now appeals.

**II.    Law and Analysis**

**A. Sufficiency**

{¶ 14} In his first assignment of error, Scott argues that his conviction for menacing by stalking was not supported by sufficient evidence.

{¶ 15} Crim.R. 29(A) provides for an acquittal "if the evidence is insufficient to sustain a conviction of such offense or offenses."   A sufficiency challenge essentially argues that the evidence presented was inadequate to support the jury verdict as a matter of law.  *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).  "'The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Getsy*, 84 Ohio St.3d 180, 193, 702 N.E.2d 866 (1998), quoting *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).  "[A] conviction based on legally insufficient evidence constitutes a denial of due process."  *Thompkins* at *id.*, citing *Tibbs v. Florida*, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed. 652 (1982).  When reviewing a sufficiency-of-the-evidence claim, we review the evidence in a light most favorable to the prosecution.  *State v. Hill*, 75 Ohio St.3d 195, 205, 661 N.E.2d 1068 (1996).

{¶ 16} R.C. 2903.211(A)(1) states, "No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause

physical harm to the other person * * * or cause mental distress to the other person[.]" Scott argues that there was insufficient evidence that he (1) engaged in a pattern of conduct, (2) acted knowingly, and (3) caused N.L. mental distress.

{¶ 17} Scott first argues that the three separates incidents — his two visits to N.L.'s workplace and one visit to N.L.'s house — do not constitute a "pattern of conduct." We disagree.

{¶ 18} A pattern of conduct is defined as two or more actions or incidents closely related in time. R.C. 2903.211(D)(1). "The incidents need not occur within any specific temporal period." *Rufener v. Hutson*, 8th Dist. Cuyahoga No. 97635, 2012-Ohio-5061, ¶ 16, citing *Jenkins v. Jenkins*, 10th Dist. Franklin No. 06AP-652, 2007-Ohio-422. Further, two incidents are enough to establish a pattern of conduct for purposes of R.C. 2903.211(A)(1). *State v. O'Reilly*, 8th Dist. Cuyahoga No. 92210, 2009-Ohio-6099, ¶ 34, citing *State v. Rucker*, 12th Dist. Butler No. CA2001-04-076, 2002-Ohio-172.

{¶ 19} Here, there was sufficient evidence that three incidents occurred — Scott's two visits to N.L.'s workplace and his one visit to N.L.'s home. At trial, Scott admitted that all three incidents occurred. Therefore, the state presented sufficient evidence of a pattern of conduct.

{¶ 20} Next, Scott argues that there was insufficient evidence that he knowingly caused N.L. mental distress. "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when

he is aware that such circumstances probably exist." R.C. 2901.22(B). Therefore, it does not matter whether Scott "intended that his actions cause fear of physical harm or mental distress[;] instead[,] what is important is [whether] he knew his actions would probably result in such fear and mental distress." *Vega v. Tomas*, 8th Dist. Cuyahoga No. 104647, 2017-Ohio-298, ¶ 15, citing R.C. 2901.22(B).

{¶ 21} Scott argues that he and N.L. "were cool" and that there were no issues during his first visit to her workplace; that he only showed up at N.L.'s home later that day because N.L. told him to pick their daughter up; and that, on the second visit to N.L.'s workplace, he was only there "to resolve a visitation issue" and tell the police his side of the story. He maintains that he "had no knowledge that these encounters would have any negative psychological impact on [N.L.]"

{¶ 22} We are unpersuaded by Scott's arguments. During his first visit to N.L.'s workplace, he threatened to take their daughter away from N.L., told N.L. that she needed his permission to drop their daughter off at a family member's house, and argued with N.L. while she was at work. N.L. also testified that Scott told N.L. that his girlfriend was going to "beat her up." During his visit to N.L.'s home later that day, he stopped N.L. from leaving her driveway to pick their daughter up from daycare, continuing to push forward into N.L.'s driveway to block her path. Finally, after calling and texting N.L. numerous times on October 27, N.L.'s supervisor called Scott, told him to not come to N.L.'s workplace again, and said she was contacting the police. Scott went to the Subway anyway and told N.L. that he was entitled to be there because she was the mother of their child.

**{¶ 23}** We find that testimony establishing that Scott went to N.L.'s workplace unannounced on two occasions, threatened her numerous times, and prohibited her from leaving her home on October 25, is sufficient evidence to show that Scott knew that his actions would probably result in mental distress.

**{¶ 24}** Finally, we turn to whether the state presented sufficient evidence that Scott caused N.L. mental distress.

**{¶ 25}** Mental distress refers to "any mental illness or condition that involves some temporary substantial incapacity or mental illness or condition that would normally require psychiatric treatment." R.C. 2903.211(D)(2). "Mental distress need not be incapacitating or debilitating * * * [and] expert testimony is not required to find mental distress." *Perry v. Joseph*, 10th Dist. Franklin Nos. 07AP-359, 07AP-360, and 07AP-361, 2008-Ohio-1107, ¶ 8. Instead, "[l]ay testimony may be sufficient" to establish mental distress. *Rufener*, 8th Dist. Cuyahoga No. 97635, 2012-Ohio-5061, at ¶ 17.

**{¶ 26}** In support of his argument that there was insufficient evidence of mental distress, Scott cites to *Cleveland Heights v. Lewis*, 8th Dist. Cuyahoga No. 79511, 2002-Ohio-2736. In that case, we stated:

> The evidence directly showed that Ms. Lewis was worried that their teenage children would be subject to Lewis's frustration or that they would not be able to "go where they needed to go," because of problems she and Lewis were having. In light of the fact that the couple had been divorced for some time and each was involved in a longstanding relationship, one could indirectly infer some quantity of mental distress caused by Lewis's then seemingly bizarre concern for the welfare of the family unit.

As a whole, however, the evidence revealed that Lewis's calls may have caused Ms. Lewis to seek refuge at her boyfriend's home, but nothing more, including acting on the concern she claims to have had for her children, who were in Lewis's home at the time of his calls. It is undisputed that Lewis never made any threat of physical harm to Ms. Lewis or anyone else.

*Id.* at ¶ 24-25. We therefore concluded that the state failed to present sufficient evidence of mental distress and reversed the defendant's conviction for menacing by stalking. *Id.* at ¶ 25.

{¶ 27} We find that *Lewis* is distinguishable. Here, N.L. testified that both of Scott's unannounced visits to her workplace caused her mental distress. She said that after his visit on October 25, during which time Scott told N.L. that his girlfriend would "beat her up" and that he would take their daughter away from her, she "couldn't think to work that rest of that day." On October 27, Scott called and messaged N.L. numerous times and N.L.'s manager told Scott to not visit N.L.'s workplace and called police. Despite this, Scott came to her workplace and told N.L. that he was allowed to do so whenever he wanted because she was the mother of his child. N.L. said she was unable to finish her shift and went home because of that incident. According to N.L., Scott engaged in "threatening behavior" and affirmatively testified that both incidents at her workplace, during which Scott threatened to take their daughter away and have his new girlfriend "beat up" N.L., caused N.L. mental distress. Unlike *Lewis*, N.L. left work as a result of Scott's threatening behavior. Also unlike the defendant in *Lewis*, Scott threatened N.L. with physical harm, telling her that his new girlfriend would "beat her up" and later

showing up to N.L.'s home with that girlfriend. We therefore find that N.L.'s testimony is sufficient to establish that Scott caused her mental distress, and we overrule Scott's first assignment of error.

**B. Manifest Weight**

{¶ 28} In his second assignment of error, Scott argues that his conviction was against the manifest weight of the evidence.

{¶ 29} A challenge to the manifest weight of the evidence tests whether the prosecution has met its burden of persuasion. *Thompkins*, 78 Ohio St.3d 380, 388, 678 N.E.2d 541 (1997). On review of a manifest weight challenge, the appellate court is tasked with reviewing all of the evidence in the record and in resolving the conflicts therein, determining whether the trier of fact '"clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."' *Id.* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶ 30} Scott argues that "no reasonable person would believe [N.L.] would sustain substantial mental distress from the incidents in question[,]" and states that N.L. and Scott had a child together and a "long-standing relationship." We disagree.

{¶ 31} Just because N.L. has a child with Scott does not mean she must be subjected to Scott's continuing harassment and threats. N.L. testified that Scott continues to threaten to take their child away from her, constantly takes her to court,

and told her on October 27, that he was allowed to come to her workplace whenever he wanted because N.L. was the mother of his child. Scott's repeated and unannounced presence at N.L.'s workplace, his threats to take away their daughter and have his new girlfriend "beat up" N.L., and his continuous calls and messages are surely enough evidence that would allow a reasonable person to believe that Scott caused N.L. mental distress. N.L. testified that after one of the incidents she was unable to finish her shift and went home. While Scott testified that he never threatened to have his girlfriend "beat up" N.L. and said that he did not argue with N.L. on October 25, the trial court did not find him credible, and based upon the evidence presented, we do not either. In light of that evidence, we find that this is not the "exceptional case" in which the evidence weighs heavily against Scott's conviction. Accordingly, we overrule Scott's second assignment of error.

{¶ 32} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cleveland Municipal Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, PRESIDING JUDGE

KATHLEEN ANN KEOUGH, J., and
MICHELLE J. SHEEHAN, J., CONCUR