[Cite as *State v. Calliens*, 2020-Ohio-4064.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,           :

                           No. 109005

    v.                            :

JAMES CALLIENS,                         :

    Defendant-Appellant.          :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 13, 2020

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-19-637580-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Michael A. Barth, Assistant Prosecuting Attorney, *for appellee.*

Andrew S. Pollis, Case Western Reserve University, Milton A. Kramer Law Clinic, Supervising Counsel, Rocco Screnci and Joseph Shell, Certified Legal Interns, *for appellant.*

MARY EILEEN KILBANE, J.:

{¶ 1} Defendant-appellant, James Calliens ("Calliens"), was found guilty on three counts of menacing by stalking under R.C. 2903.211(A)(1). He was

sentenced on August 15, 2019, to a seven-month concurrent sentence. He now appeals his conviction and asks this court to reverse. For the reasons that follow, we affirm.

## I.    PROCEDURAL BACKGROUND

{¶ 2} Calliens was indicted on March 14, 2019, with three counts of menacing by stalking, all fourth-degree felonies, under R.C. 2903.211(A)(1) and one count of telecommunications harassment, a first-degree misdemeanor, under R.C. 2917.21(A)(5). The menacing by stalking charges were for offenses committed January 6, 2019 (Count 1), January 14, 2019 (Count 2), and February 22, 2019 (Count 3). All three contained furthermore clauses alleging that Calliens trespassed during each offense.

{¶ 3} Calliens pled not guilty and waived his right to a jury trial. The case proceeded to a bench trial on June 24, 2019. Before trial, the state amended Count 2 by deleting the furthermore clause, which lowered the charged offense to a first-degree misdemeanor.

{¶ 4} Calliens moved for acquittal under Crim.R. 29 at the close of the state's case. The court denied the motion as to Counts 1, 2, and 3, but granted the motion as to Count 4, the telecommunications harassment charge.

{¶ 5} Calliens renewed his motion for acquittal at the close of the case and the court again denied the motion. The trial court found Calliens guilty of all three counts of menacing by stalking on June 27, 2019, and sentenced Calliens on August 15, 2019, to seven months in prison on Counts 1 and 3 and 180 days in county jail on

Count 2. All sentences were concurrent. Calliens was also subject to a three-year discretionary period of postrelease control for Counts 1 and 3.

## II. FACTUAL BACKGROUND

{¶ 6} Calliens, now 40 years old, began dating the victim, Joanne Eden ("Eden") around 2007. They met at a Walgreens. Calliens and Eden disagree about whether Calliens ever lived with Eden, but the record supports that Calliens would at least spend nights at Eden's home and kept some belongings there.

{¶ 7} Calliens currently lives with Nicole Coss ("Coss"), who is the mother of his two-year-old son. He met Coss around September 2013. At the time of the trial and the events described herein, he was married to, but not living with, a third woman. While Calliens was married, but dating Eden, Coss became pregnant with his child. Calliens testified that the pregnancy caused some strife in his relationship with Eden, but that he and Eden continued to date.

{¶ 8} Eden and Calliens agreed that they had an on-again-off-again relationship pattern. Calliens testified that they would usually get back together after a fight:

> Like I never like engaged her and tried to get – forcibly, like I'll let her cool off for about a week or two then go over and see if she'll calm down; you know what I'm saying? It wasn't no stalking her down, nothing like that.

(Tr. 126:4-9.)

{¶ 9} Eden testified that she ended her relationship with Calliens in person around the beginning of November 2018 "because he was seeing other girls and stuff like that so I was just done with all of it." (Tr. 20:10-11.) She said she had this

conversation with him several times, but that he refused to accept that she wanted to end the relationship.

**{¶ 10}** Calliens testified that Eden never told him that she no longer wanted to speak to him and that he was confused about the status of their relationship:

> Because she never like — she never like broke it off like. I don't see how we — she never told me or this and that, that we broke up. She never did that. She never called me and told me none of that. That's why I was going over there trying to see what is really going on. Then after I go over there she told me she had a [health concern] or whatever, and then that's why I kept going over there to see what was going on.

(Tr. 137:8-23.)

**{¶ 11}** Eden testified that after breaking up with Calliens he "would sit in my driveway for hours, in front of my house for hours, around the corner for hours and wouldn't leave." (Tr. 59:12-14.) She testified: "he just plays stupid like he doesn't understand what I'm trying to say. I've told him verbally, text message [sic] that I don't want anything to do with him; I don't want him around me." (Tr. 60:16-20.) Eden testified that eventually she "just started calling the police because he wouldn't stop" coming to her home after she had ended the relationship. (Tr. 22:16-19.)

**{¶ 12}** Calliens testified that the police started getting involved in their relationship in 2018, but that he does not know why:

> Q: All right. And tell the Court, if you can, when did the police start getting involved in the relationship?
>
> A: Like 2018.
>
> Q: And why?
>
> A: That's the biggest question I'm trying to figure out; like I don't really know. Like she never — like every time I came to her house she

always lock[ed] her door. I called her, left nice messages to her. I never got like no response.

(Tr. 119:21-120:5.)

{¶ 13} Eden testified that she called the police because of Calliens on eight or nine separate occasions. She described one incident with Calliens on cross-examination in which she had her daughter call the police because Calliens "came to my house, walked in my house, went down to my shoe closet and started taking shoes out." (Tr. 56:3-4.) After Calliens "smacked" Eden in the face, she ran out of the house and asked her daughter to call the police. (Tr. 56:7.) She thought the incident occurred around September 2018, but said it happened after she had tried to break up with Calliens.

{¶ 14} Around November 15, 2018, Eden and Calliens encountered each other at Walmart while he was with Coss and their son. Eden testified that she broke up with Calliens before running into him at Walmart that month. Calliens testified that he and Eden talked for about ten minutes during the encounter and continued to "hookup" after that meeting. (Tr. 120:24-121:6.)

{¶ 15} There was at least one instance where Eden willingly saw Calliens after breaking up with him. Her ten-year-old niece passed away around December 4, 2018, and Calliens attended the funeral. Eden did not inform Calliens about the funeral; her sister did. Afterwards, he spent the night at Eden's home with her. On cross-examination, Eden testified as follows about the incident:

Q: And did he bully you into staying over your house that night?

A:      No, he just made it uncomfortable because he just followed me and my daughter home.  And I wasn't — and I was already stressed out; I just lost my niece so I just let him spend the night.  I didn't feel like arguing, anything like that.

Q:      But the reality is you know how to call the police on him, though.  Right?  So that night after the funeral you could have called the police on him and said:  "He came to the funeral and that's cool but I don't want him at the house."  But you didn't do that.  Did you?

A:      No, because I wasn't trying to be mean to anyone with the funeral going on and all that.

(Tr. 48:10-24.)

{¶ 16} Coss testified that after Eden's niece's funeral, she drove past Eden's house on December 8, 2018, early in the morning and saw Calliens's car parked in her driveway.  She suspected they were still romantically involved at that point.

{¶ 17} Around December 24, 2019, Eden described an incident in which Calliens chased her car to retrieve Christmas presents that he had left at her door. She testified that he punched her car and she "drove straight to the police station." (Tr. 23:24.)

{¶ 18} Eden testified that starting no later than 2019, she did not answer any phone calls or text messages from Calliens.  Calliens agreed that they last spoke in December 2018, but testified that Eden texted him in February around Valentine's Day.  She admitted that she and Calliens had an on-and-off again relationship pattern, but stated that he was never as persistent in coming around her after a break-up as he was beginning around November 2018.

{¶ 19} On January 6, 2019, Eden testified that, on one occasion, she returned home and observed urine on her door.  Eden's next door neighbor, Megan

Bowman ("Bowman") testified that she heard knocking on Eden's door after dark and saw that it was Calliens. She also testified that she saw Calliens urinate on the door. Eden reported the incident to the police. Officer Ecklin Woods ("Woods") testified that he and his partner responded to a call on January 6, 2019, from Eden regarding a stalking incident involved Calliens, but that Calliens had left the scene before the police arrived. Calliens denied he ever urinated on Eden's door. The state submitted her 911 phone call into evidence to show Eden's state of mind as to why she called 911 that night. Calliens testified that after January 6, 2019, when he did see Eden that she did not appear to be stressed or afraid. This incident was charged as Count 1.

{¶ 20} On another occasion, around January 11, 2019, Calliens knocked on the door of one of Eden's friends, Rita Robinson ("Robinson") while Eden was at Robinson's house. Robinson testified that she saw Calliens appear at her doorway on her video security system that evening. She also saw someone peeking in her windows at the top of the doorway to her home. The security footage itself was not submitted as evidence.

{¶ 21} Eden called the police again on January 14, 2019, while in her car on the way home from her work. She called because she noticed that Calliens was following her in his car and she did not want him around her. She testified that at some point on her way home, she was speeding to get away from him and had to drive over a curb because he was blocking her route with his car. She called 911. She estimated that he followed her for at least ten minutes or two to four miles. He did

not follow her all the way home because she stopped elsewhere to avoid him. This incident was charged as Count 2.

{¶ 22} The state also submitted a video that Eden recorded on her cell phone that recorded part of an exchange with Calliens. The video is about two minutes long. Eden recorded the video from inside her house with Calliens standing outside her door. The video is visually dark; all that can be seen are the drawn blinds covering the window in Eden's door. Eden testified that she kept the lights off in her house to make it appear as though she was not home.

{¶ 23} In the video, Eden repeatedly and emphatically stated that she wanted Calliens to leave and stay away from her. Calliens repeatedly ordered her to open the door. After repeatedly stating that she was going to call the police, Calliens stated that he did not care about going to jail and that "there will be consequences" as soon as he gets out. Eden did not remember whether she called the police that night.

{¶ 24} Another time, Calliens appeared at Robinson's home while Eden was also present. Robinson let him inside. Eden hid in another room while Calliens talked with Robinson. Eden testified that she did not call the police that night because her phone was in the other room and there was no landline she could have used.

{¶ 25} At some point after Eden had involved the police, Eden informed Calliens about a health concern. Eden testified that she never invited Calliens over to discuss it, but that he showed up anyway. Calliens testified: "Well, I happened to

see her as she was pulling in the driveway. And she get[s] out, and I didn't want to make it look like I was trying to stalk her or like that." (Tr. 123:9-12.) He testified that he expected to speak with Eden about her health concern.

{¶ 26} On February 22, 2019, Calliens was arrested. Eden testified that after she had come home from work, she saw Calliens outside looking into her home through one of her windows. She testified:

> Well, I just came home and I went to run bath water. And I just had a feeling that — I got that feeling so I went in my grandkids' toy room, looked out their window and I could see him by my bathroom window.

(Tr. 34:14-18.)

{¶ 27} She immediately called 911 and testified that she did not give Calliens permission to be on her property. Officer Cory Beckwith ("Beckwith") testified that he responded to a dispatch to Eden's home on February 22, 2019, and recalled that the dispatch was about a "stalking male looking through windows." (Tr. 97:25-98:1.) Upon his arrival to Eden's home, he observed Calliens trying to hop over a fence. The officers placed Calliens under arrest. Several hours after the arrest, the officers went back to the scene to see if they could find Calliens's vehicle. They found it about a half block away from Eden's home. Eden also testified that after the officers arrested Calliens, she drove two streets over and saw Calliens's car parked. She recognized his vehicle and license plate number. Calliens testified that the vehicle was not his. This incident was charged as Count 3.

{¶ 28} Eden testified that all these incidents caused her stress and paranoia starting around November 2018:

Q: So these incidents that we've talked about, did they cause you stress?

A: Yes, and paranoid [sic].

Q: How so?

A: Just because I didn't — like I would catch him looking through my shades in my window so I started keeping all my shades closed, all my curtains. When I'd come home from work I would run around the house just to make sure I didn't see him, but it was kind of like he had a GPS on me or something. Everywhere I would go; at the school, the auto parts store, he would be there before I even got there. Like how did you know I was going there?

(Tr. 42:5-18.)

{¶ 29} She also testified that her paranoia and stress affected her behavior:

Q: And let's also talk about this: You told the Prosecutor on direct that you experienced some kind of stress from all this?

A: Yeah. You're very paranoid when someone is looking through your shades and your curtains and following you and everywhere you go he pops up.

Q: Okay. Now, what did you do about this paranoia and all this stress?

A: What could I do? Keep the curtains closed, just watch my surroundings.

(Tr. 57:15-24.)

{¶ 30} She testified that she would keep the lights off when she was home and "acted like I wasn't home half the time." (Tr. 39:2-3.) Eden did not see a mental health professional, but testified that she probably would have if she had insurance. Eden also acknowledged on cross-examination that she partly contributed to her stress by continuing to interact with Calliens.

{¶ 31} This appeal follows. Calliens asserts the following two assignments of error:

Assignment of Error No. 1

The trial court erred in denying Calliens' Crim.R. 29 motions as to counts[] 1, 2, and 3 because the state failed to produce sufficient evidence of guilt under R.C. 2903.211(A)(1).

Assignment of Error No. 2

Alternatively, the trial court's finding of guilt on Counts 1, 2, and 3 is against the manifest weight of the evidence.

## III. LAW AND ANALYSIS

{¶ 32} Calliens was convicted of menacing by stalking under R.C. 2903.211(A)(1). The statute states, "No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person * * * or cause mental distress to the other person[.]" Calliens argues in his first assignment of error that there was insufficient evidence that he (1) caused Eden mental distress as to all counts; (2) acted knowingly as to all counts; and (3) engaged in a pattern of conduct as to Count 1. Based on the alleged insufficient evidence, he argues that the trial court erred in not granting his Crim.R. 29(A) motion. In his second assignment of error, he alternatively argues that his conviction was against the manifest weight of the evidence for the same reasons. We disagree and overrule both assignments of error.

{¶ 33} We will address Calliens's first and second assignments of error together for ease of discussion.

## A. Sufficiency Standard of Review

{¶ 34} "'A Crim.R. 29(A) motion for acquittal tests the sufficiency of the evidence.'" *State v. Fisher*, 8th Dist. Cuyahoga No. 105802, 2018-Ohio-2189, ¶ 9, quoting *State v. Capp*, 8th Dist. Cuyahoga No. 102919, 2016-Ohio-295, ¶ 19.

> "Crim.R. 29 mandates that the trial court issue a judgment of acquittal where the state's evidence is insufficient to sustain a conviction for an offense. Accordingly, an appellate court reviews a trial court's denial of a defendant's motion for acquittal using the same standard it applies when reviewing a sufficiency-of-the-evidence claim."

*Fisher* at ¶ 9, quoting *State v. Hoskin-Hudson*, 8th Dist. Cuyahoga No. 103615, 2016-Ohio-5410, ¶ 7.

> With respect to sufficiency of the evidence, "'sufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *Black's Law Dictionary* 1433 (6 Ed.1990). *See also*, Crim.R. 29(A) (motion for judgment of acquittal can be granted by the trial court if the evidence is insufficient to sustain a conviction). In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law. *State v. Robinson*, 162 Ohio St. 486, 124 N.E.2d 148 (1955). In addition, a conviction based on legally insufficient evidence constitutes a denial of due process. *Tibbs v. Florida*, 457 U.S. 31, 45, 102 S.Ct. 2211, 2220, 72 L.Ed.2d 652, 663 (1982), citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

*Fisher* at ¶ 10, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997).

## B. Manifest Weight Standard of Review

{¶ 35} "In contrast to a challenge based on sufficiency of the evidence, a manifest weight challenge attacks the credibility of the evidence presented and questions whether the state met its burden of persuasion at trial." *State v. Watson*,

8th Dist. Cuyahoga No. 109044, 2020-Ohio-3462, ¶ 49, citing *State v. Whitsett*, 8th Dist. Cuyahoga No. 101182, 2014-Ohio-4933, ¶ 26, citing *Thompkins* at 387, *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13.

{¶ 36} "In our manifest weight review of a bench trial verdict, we recognize that the trial court is serving as the factfinder, and not a jury:

> "Accordingly, to warrant reversal from a bench trial under a manifest weight of the evidence claim, this court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in evidence, the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered."

*Watson* at ¶ 50, quoting *State v. Bell*, 8th Dist. Cuyahoga No. 106842, 2019-Ohio-340, ¶ 41, citing *State v. Strickland*, 183 Ohio App.3d 602, 2009-Ohio-3906, 918 N.E.2d 170, ¶ 25 (8th Dist.).

{¶ 37} "A conviction should be reversed as against the manifest weight of the evidence only in the most 'exceptional case in which the evidence weighs heavily against the conviction.'" *Watson* at ¶ 51, quoting *Thompkins*, 78 Ohio St. 3d at 387, 678 N.E.2d 541.

{¶ 38} Finally, "[a] finding that a conviction was supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." *State v. Taylor*, 8th Dist. Cuyahoga No. 108347, 2020-Ohio-3589, ¶ 40, citing *State v. Robinson*, 8th Dist. Cuyahoga No. 96463, 2011-Ohio-6077.

### 1. Mental Distress

{¶ 39} Calliens argues that the manifest weight of the evidence contradicts the trial court's finding that Calliens caused Eden to suffer mental distress. In sum, they argue that the evidence, at best, shows that Eden was merely annoyed, but did not suffer any "temporary substantial incapacity." R.C. 2903.211(D)(2).

{¶ 40} Calliens notes that Eden was the only witness who testified about her mental distress and characterizes her testimony as "lip service" to the mental distress element. He next argues that it is telling that her friend, Robinson, did not testify to Eden's mental distress because Eden would have mentioned any stress to her friend and Robinson would not have welcomed Calliens into her home if she were aware of the mental distress he was causing Eden. He also contends that Eden's January 6, 2019 emergency call and cell-phone video recording weigh against Calliens's conviction and do not demonstrate mental distress. He argues that the video and phone recording do not reveal any discomfort on Eden's part and that she does not sound worried or afraid, but merely annoyed.

{¶ 41} "Mental distress" is defined to mean any of the following:

(a) Any mental illness or condition that involves some temporary substantial incapacity;

(b) Any mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services, whether or not any person requested or received psychiatric treatment, psychological treatment, or other mental health services.

R.C. 2903.211(D)(2).

{¶ 42} "'Lay testimony may be sufficient' to establish mental distress." *Cleveland v. Scott*, 8th Dist. Cuyahoga No. 108305, 2019-Ohio-5244, ¶ 25, quoting *Rufener v. Hutson*, 8th Dist. Cuyahoga No. 97635, 2012-Ohio-5061, ¶ 17. Expert testimony of mental distress is not required. *Id.* Involving the police is also evidence of mental distress. *N.F. v. M.F-.N.*, 89 Ohio App.3d 77, 2015-Ohio-4546, 42 N.E.3d 829, ¶ 28 (11th Dist.), citing *Fortney v. Willhoite*, 11th Dist. Lake No. 2011-L-120, 2012-Ohio-3024, ¶ 41. However, "mental distress must be proven by facts introduced at trial and the reasonable inferences springing from those facts." *State v. Beckwith*, 8th Dist. Cuyahoga No. 98497, 2013-Ohio-492, ¶ 15, citing *Cleveland Hts. v. Lewis*, 8th Dist. Cuyahoga No. 79511, 2002-Ohio-2736, ¶ 22; *Rufener* at ¶ 17. R.C. 2903.211 was "'not enacted for the purpose of alleviating uncomfortable situations,'" but we find there was sufficient evidence that Eden suffered mental distress and was not merely uncomfortable. *Beckwith* at ¶ 15, quoting *State v. Cannon*, 8th Dist. Cuyahoga No. 95426, 2011-Ohio-2394, ¶ 21.

{¶ 43} Here, the manifest weight of evidence supports that Eden suffered mental distress because of Calliens. We agree with the trial court that Eden's testimony regarding her mental distress was credible. She testified that his behavior caused her stress and paranoia beginning in November 2018. She testified that it was like Calliens "had a GPS" on her and that wherever she went, "he would be there before I even got there." (Tr. 42:14-16.)

{¶ 44} Eden also explained that the paranoia she felt affected her behavior. She testified that she drove over a curb to escape Calliens following her in his vehicle.

She was so distressed by Calliens that she stated she called the police eight or nine times. Eden's testimony also demonstrates that she was so paranoid that Calliens was always following her that she would shut her blinds and keep the lights off in her house while she was home so that it appeared she was not home. She could not even draw a bath for herself in her own home at the end of the day without having the feeling that Calliens was watching her and actually checking to see whether he was. Her fear was not unfounded; she caught Calliens peering into her home through the bathroom window on at least one occasion after breaking up with him. Although Eden did not seek medical treatment for mental distress, which is not required for the state to prevail, she testified that she would have if she had medical insurance to pay for it.

{¶ 45} Moreover, we disagree with Calliens that Eden's testimony is the only evidence of mental distress. Calliens's own testimony also demonstrated that Eden was distressed by him. Calliens admitted that Eden involved the police in their relationship in 2018, which indicates that Eden was suffering some amount of mental distress. That he claims to not know why Eden was calling the police does not mean Eden was not distressed. He also testified that Eden did what she could to keep Calliens out of her life:

> Like she never — like every time I came to her house she always lock her door. I called her, left nice messages to her. I never got like no response.

(Tr. 120:2-5.)

{¶ 46} By Calliens's own admission, Eden did not respond to Calliens's "nice" messages and locked her door to keep him out. She was mentally distressed by his presence and altered her behaviors to avoid him.

{¶ 47} As Calliens points out, Eden's friend, Robinson, did not make any comment regarding whether Eden was distressed. Her lack of testimony on that topic does not weigh heavily against conviction. Robinson was Eden's boss. Although they knew each other for many years, reasonable minds could conclude that Robinson and Eden did not have the type of intimate relationship in which Eden would feel comfortable sharing details about her mental distress. Further, Eden began visiting Robinson in late November 2018 to comfort her after Robinson's husband passed away. Reasonable minds could conclude that Eden chose not to confide in Robinson so that Robinson could grieve.

{¶ 48} We also find that Eden's 911 call and video-recorded interaction with Calliens weigh in favor of his conviction. A brief lighthearted moment with the operator during the 911 call about whether Calliens had any mental health problems is not proof that Eden was carefree and undisturbed. Eden sounds troubled on the call and her quip about Calliens's mental health does not communicate a calm or relaxed mental state, but concern about the situation. Moreover, as mentioned, the fact that she was involving the police in the first place evidences mental distress.

{¶ 49} Reasonable minds could conclude that the video interaction between Eden and Calliens also shows that Eden was distressed by Calliens's presence and resolute about him leaving her alone. The video also lends credibility to her

testimony about leaving the lights off while she is home to make it appear that she was not there. Considering all this evidence, we agree with the trial court that the evidence on mental distress was sufficient and that the manifest weight of it demonstrates that Calliens caused Eden mental distress.

### 2. Calliens's Knowledge

{¶ 50} Calliens next argues that, even if Eden's testimony satisfied the statutory definition of mental distress, the manifest weight of the evidence contradicts the trial court's finding that Calliens knowingly caused her distress. Calliens's arguments are not well-taken.

{¶ 51} "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B). It does not matter whether Calliens intended to cause mental distress, but only whether "'he knew his actions would probably result in such fear and mental distress.'" *Scott,* 8th Dist. Cuyahoga No. 108305, 2019-Ohio-5244, at ¶ 20, quoting *Vega v. Tomas*, 8th Dist. Cuyahoga No. 104647, 2017-Ohio-298, ¶ 15, citing R.C. 2901.22(B).

{¶ 52} Calliens first argues that he merely thought this was another fight like others during their 12-year relationship and that there was no evidence he knew he was causing Eden mental distress. He argues that given his 12-year relationship with Eden, he could only conclude that if he talked to Eden, they would be a couple once more.

{¶ 53} Just because Calliens had a past relationship with Eden does not mean she must be subjected to his continuing harassment and threats. Although Calliens testified that they would usually get back together after about two weeks, his testimony reveals that this time was different. Calliens testified that this time, he "called her [and] left nice messages to her," but that he "never got like no response." (Tr. 119:21-120:5.) His testimony supports that he noticed this time was different. He knew Eden did not want to see him or reconcile with him and was distressed by his unwanted overtures.

{¶ 54} While Calliens testified that Eden never broke up with him or told him she did not want to see him, Eden testified that she told him exactly that several times. The trier of fact could have found Eden's testimony to be more credible. Eden repeatedly told Calliens she did not want to see him, drove over a curb to escape him, and called the police on him on eight or nine occasions.

{¶ 55} Calliens also argues that Eden's silence toward Calliens in early 2019 indicated to him that he was doing nothing wrong or causing her mental distress. Calliens testified that he did not understand why Eden was avoiding him and that, after January 6, 2019, Eden never appeared to be stressed or afraid of him. However, considering all the evidence, reasonable minds could conclude Eden's silence indicated to Calliens that this time was different. Whereas Calliens testified that they usually would get back together after one or two weeks, Eden was unreceptive this time. Her silence told him that she did not want to see him.

{¶ 56} Asserting that this time was no different, Calliens latches onto the fact that Eden willingly spent the night with Calliens in early December after her 10-year-old niece's funeral. The December 4, 2018 meeting does not sway this court for two reasons. First, as discussed, there is sufficient evidence both before and after December 4, 2018, to support that Calliens knew he was causing Eden mental distress. Second, reasonable minds could conclude that their intimacy on December 4, 2018, did not indicate that Eden wanted to get back together with Calliens. Eden testified that she did not invite Calliens to the funeral and did not invite him over afterwards, but that "he just followed me and my daughter home." She further explained: "I just lost my niece so I just let him spend the night" and that she "wasn't trying to be mean to anyone with the funeral going on and all that." (Tr. 48:10-24.) Reasonable minds could infer that Eden was emotionally exhausted that night, so numb at attending her ten-year-old niece's funeral that she "just let him spend the night" because she did not have the emotional or physical capacity to force Calliens to leave after following her home.

{¶ 57} Calliens also argues that the cell-phone video reveals that that must have been the first time Eden told Calliens she called the police on him because she did not say she would call the police *again* or otherwise indicate that she previously told him not to come to her house. This argument does not hold up, however, because Calliens testified that Eden involved the police in the relationship in 2018.

{¶ 58} Further, Calliens's own behavior indicates that he knew he was distressing Eden. He threatened Eden in the video recording, saying that there

would be consequences if she did not let him in her home. It is reasonable to conclude that an individual who makes a threat knows they are causing mental distress. Also, after the February 22, 2019 incident, after which Calliens was arrested at Eden's home, Eden and the arresting officer testified they later saw his vehicle parked a few blocks away. Eden recognized the car and knew his license plate number. Surreptitiously parking his car a few streets away before heading over to Eden's home supports that Calliens knew seeing his vehicle would cause Eden mental distress and perhaps cause her to call the police again before he could reach her.

{¶ 59} Calliens also argues that the fact Robinson let Calliens into her home indicated to Calliens that nothing had changed in his relationship with Eden. Any connection between Robinson's interactions with Calliens and whether he knew he was causing Eden mental distress is tenuous at best. As discussed, it is reasonable to conclude that Eden did not confide all the details of her former relationship and mental distress with Robinson. Perhaps Robinson thought she could help Eden by talking to Calliens and convincing him to stay away from Eden once and for all. Or, it is possible Robinson thought she was being helpful by occupying Calliens while Eden safely hid in another room during his visit. Robinson's willingness to talk to Calliens does not require us to conclude that Calliens had no knowledge that he was disturbing Eden.

{¶ 60} Considering all the evidence, we find that it weighs more heavily toward finding that Calliens was aware he would probably cause Eden mental

distress by continuing to contact her. The trial court's verdict is not against the manifest weight of the evidence.

### 3. Pattern of Conduct as to Count 1

{¶ 61} Calliens also argues that the state failed to prove Calliens engaged in a pattern of conduct before January 6, 2019, which was charged as Count 1.

{¶ 62} "Pattern of conduct" is defined to mean

> [T]wo or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents, or two or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents * * *.

R.C. 2903.211(D)(1).

{¶ 63} "[T]wo incidents are enough to establish a pattern of conduct for purposes of R.C. 2903.211(A)(1)." *Scott*, 8th Dist. Cuyahoga No. 108305, 2019-Ohio-5244, ¶ 18, citing *State v. O'Reilly*, 8th Dist. Cuyahoga No. 92210, 2009-Ohio-6099, ¶ 34, citing *State v. Rucker*, 12th Dist. Butler No. CA2001-04-076, 2002-Ohio-172. Further, "'[t]he incidents need not occur within a specific temporal period.'" *Scott* at ¶ 18, quoting *Rufener*, 8th Dist. Cuyahoga No. 97635, 2012-Ohio-5061, ¶ 16, citing *Jenkins v. Jenkins*, 10th Dist. Franklin No. 06AP-652, 2007-Ohio-422.

{¶ 64} Calliens concedes that the January 6, 2019 incident itself can serve as one incident, but argues that the state failed to present evidence of any other prior incident. He argues that the only evidence of any prior incidents were the November 15, 2018 meeting at Walmart and the night of Eden's niece's funeral on December 4,

2018, and that both incidents do not establish a pattern of conduct on Calliens's part because they were initiated by Eden. However, the state presented other sufficient evidence that weighs in favor of finding that Calliens engaged in a pattern of conduct sometime before January 6, 2019.

{¶ 65} Eden testified that after the breakup, Calliens "would sit in my driveway for hours, in front of my house for hours, around the corner for hours and wouldn't leave." (Tr. 59:12-14.) Coss similarly testified that she saw Calliens's car parked in Eden's driveway on December 8, 2018. Although Coss testified that she suspected the two were still romantically involved, reasonable minds could conclude, in light of all the other evidence, that Calliens was there uninvited. Most specifically, Eden testified that Calliens punched her car on December 24, 2018, and was trying to retrieve Christmas presents that he had left at her house. She immediately drove to the police and reported the incident. The December 24, 2018 incident established a prior incident that demonstrates a pattern of conduct prior to January 6, 2019.

{¶ 66} We find that there was sufficient evidence presented to overcome Calliens's Crim.R. 29 motions. We further find that this is not the exceptional case where the evidence weighs heavily against Calliens's conviction. Accordingly, we overrule Calliens's first and second assignments of error.

{¶ 67} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
MARY EILEEN KILBANE, JUDGE

KATHLEEN ANN KEOUGH, P.J., and
EILEEN A. GALLAGHER, J., CONCUR