[Cite as *Chagrin Falls v. Ptak*, 2020-Ohio-5623.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| VILLAGE OF CHAGRIN FALLS, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 109342 |
| v. | : | |
| JUSTIN PTAK, | : | |
| Defendant-Appellant. | : | |

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** December 10, 2020

Criminal Appeal from the Bedford Municipal Court
Case No. 18CRB01644

### *Appearances:*

Diemert & Associates Co., L.P.A., Thomas M. Hanculak, Village of Chagrin Falls Prosecutor; and Lauryn G. Kitchen, *for appellee.*

Patituce & Associates, L.L.C., Joseph C. Patituce, and Megan M. Patituce, *for appellant.*

MARY J. BOYLE, P.J.:

{¶ 1} Defendant-appellant, Justin Ptak, appeals his conviction of menacing by stalking. He raises five assignments of error for our review:

1. Appellant's conviction for menacing by stalking is not supported by legally sufficient evidence as required by our state and federal constitution.

2. The trial court erred by allowing the admission of cell phone records without proper authentication resulting in appellant being denied his right to a fair trial as required by our state and federal constitutions.

3. The trial court erred by allowing admission of hearsay testimony regarding to whom a license plate was registered or the failure to object constituted ineffective assistance of counsel.

4. The prosecutor's comments in closing argument constitu[t]e prosecutorial misconduct and deprived appellant of the right to a fair trial under our state and federal constitution.

5. Appellant's conviction for menacing by stalking was against the manifest weight of the evidence in violation of our state and federal constitutions.

{¶ 2} Finding no merit to his assignments of error, we affirm.

## I. Procedural History and Factual Background

{¶ 3} In August 2018, Ptak was charged with telecommunications harassment in violation of R.C. 2917.21(A)(1), a first-degree misdemeanor; and menacing by stalking in violation of R.C. 2903.211(A)(1), a first-degree misdemeanor. In October 2019, a jury trial ensued. Plaintiff-appellee, the village of Chagrin Falls ("Chagrin Falls"), presented the following evidence at trial.

{¶ 4} Ptak went to high school with the victim, C.W., and the two dated in 2016. C.W. testified that she and Ptak dated for five months when she was seventeen years old and in the eleventh grade. In the early spring of 2016, C.W. ended the relationship because it was "overwhelming" and "emotionally demanding," she did things she "wasn't comfortable" doing, and Ptak would "excessively" call and text

her. C.W. testified that after she ended the relationship, Ptak continued to "excessive[ly]" call and text her. Some of the messages were "love texts," but others were "angry, demeaning" messages. C.W. told Ptak not to contact her anymore, but "he kept on doing it," and C.W. blocked his phone number. She explained that at some point in 2016, she and her parents contacted the Geauga County Sheriff's Office about Ptak because of the content and frequency of his text messages and his refusal to stop sending them. C.W. testified that her mother was "scared" and thought Ptak was "unstable." The sheriff told Ptak to stop contacting C.W., and he temporarily stopped.

{¶ 5} In 2017, C.W. moved from Ohio to Minnesota. C.W. unblocked Ptak's phone number and had one "very simple back-and-forth text conversation" about a mutual friend. But when C.W. realized that Ptak interpreted the conversation as her romantically "advancing" on him, she blocked his phone number again. C.W. testified that Ptak repeated a pattern of texting her from phone numbers she did not recognize "a bunch of times" within a few days and then "stop[ping] for a little bit." She said that after she went to the police in 2016, Ptak stopped using his name in the text messages. She explained that she knew the texts were from Ptak because of the content of the messages and that the messages referred to her by names that only Ptak called her. C.W. was dating somebody else, and she asked her boyfriend to tell Ptak to stop contacting her. She made the same request of the housing manager where she was living She testified that the texts temporarily stopped after her boyfriend and housing manager reached out to Ptak, but then the messages

restarted. In the summer of 2017, C.W. moved back in with her parents in Ohio, and in early 2018 she moved into an apartment in Chagrin Falls with her boyfriend. Ptak continued to text her from phone numbers she did not recognize. C.W. testified that she felt "powerless, disrespected, [and] violated."

{¶ 6} C.W. testified that in March 2018, she received a text message that said, "I miss you," and, "I still have the pictures you gave me." C.W. thought the reference was to nude photos, became "very upset," unblocked Ptak's phone number, texted him to try to get the photos back, and called him to warn him that she would call the police if he did not return the photos. She said that Ptak responded by sending her "the picture that he was talking about" and claiming that he did not have any nude photos.

{¶ 7} In May 2018, C.W.'s mother got a puppy, and C.W. posted a picture of the puppy on social media. C.W. had blocked Ptak from her social media accounts, but after she posted the puppy photo, C.W. received a text message from a number she did not recognize that said it would "be a shame if something happened" to the puppy. C.W. testified that she "kn[e]w" the text came from Ptak but that she did not have "hard evidence." C.W. was "really concerned" about the text message, and her mother was "very, very scared." Her mother contacted the Geauga County Sheriff's Office, which instructed C.W. how to send a cease-and-desist letter to Ptak via certified mail. C.W. sent Ptak the letter on May 11, 2017, instructing him not to contact her anymore and advising him that she would report any further communication attempts to the police. C.W. received a receipt reflecting

that the letter had been delivered. An employee from the U.S. Post Office in Chagrin Falls testified that she delivered the letter to Ptak's address on May 12, 2018. C.W. testified that the text messages stopped "temporarily" after she sent the letter. But soon she continued to receive messages from him. She reported the messages to the Chagrin Falls Police Department, who told Ptak to stop contacting her.

{¶ 8} On August 27, 2018, C.W. found a letter and roses on her car parked in a lot across from her apartment building. The letter was signed by "Justin." In the letter, Ptak expressed his love for C.W., said he felt "awful" about the "terrible things" he said to her, and asked her to not "give up" on him. C.W., her boyfriend, and her father went to the Chagrin Falls Police Department that day to "get [Ptak] to stop." Sergeant Jason Fischer, a Chagrin Falls police officer, testified that he initiated a written and video-recorded report with her. C.W. told Sergeant Fischer that she did not think that Ptak would cause her physical harm but that she was "freaked out" by his behavior. She testified that it was not "productive for [her] to live [her] life catastrophizing" that he would kill her or beat her up, but that it was "frightening" that he figured out where she lived. She explained that she never told Ptak where she lived, and they no longer had friends in common who could have told him. She testified that she wrote in her statement that she was "scared." C.W. switched cars with her mother for a few weeks, hoping that Ptak would not recognize the car, not "mess with" her car, and not know where she was.

{¶ 9} On the afternoon of August 28, 2018, Sergeant Fischer reached Ptak by telephone and told him "that he was absolutely not in any way, shape, or form to

contact [C.W.] from this point forward." On August 29, around 1:00 p.m., Ptak came to the police station with his mother, and Sergeant Fischer processed charges against him for telecommunications harassment and menacing by stalking. Sergeant Fischer "bonded [Ptak] out right then and there via personal bond," and he was released around 2:45 p.m.

{¶ 10} Detective Andrew Capwill, a detective sergeant for the Chagrin Falls Police Department, subpoenaed the phone records from January 1, 2018, through September 11, 2018, for C.W.'s cell phone from Verizon and Ptak's cell phone from AT&T. Detective Capwill explained that the records show that Ptak called C.W. 55 times in 2018: 1 call in February, 6 in March, 14 in June, 16 in July, and 18 in August. C.W. called Ptak once on March 2, 2018, which C.W. testified was the incident regarding the photos. On August 27, 2019, the day that C.W. found the love letter and roses on her car, Ptak called C.W. twice. He called her again at 11:06 a.m. on August 28, at 2:39 a.m. on August 29 (after Sergeant Fischer instructed him to stop contacting C.W.), and at 8:05 p.m. on August 29 (after he had been charged).

{¶ 11} In September 2018, the trial court issued a no-contact order against Ptak.

{¶ 12} In February 2019, as this case was proceeding, C.W. noticed a car following her while she was driving. The car followed her to her apartment complex and parked when she parked. She went inside the leasing office to deposit her rent, and the driver was still in the car that had been following her when she returned to her car. The other car followed her out of the parking lot. She pulled over to the side

of the road, and the other car also pulled over. As she continued to drive and pull into a Panera Bread parking lot, so did the other car. C.W. observed that the driver was a man with the hood of his sweatshirt covering his head. She suspected the driver was Ptak and used her cell phone to take a video of the car as she walked into Panera Bread. After a few minutes, C.W. walked back to her car holding up her phone to make it "more obvious" that she was recording, and the other car left. C.W. obtained the license plate and reported the incident to the Chagrin Falls police. She said that the police ran the license plate through their database, and an officer told her that the vehicle was registered to Ptak's mother. Sergeant Fischer likewise testified that on February 3, 2019, C.W. came to the station again, and he obtained her statement about being followed. He said he viewed the video C.W. captured, ran the license plate through the law enforcement automated data system, and generated a report ("LEADS report") that stated the owner of the vehicle was Kathleen Ptak.

{¶ 13} At the end of the state's case, Ptak moved for a Crim.R. 29(A) acquittal. The trial court denied the motion. Ptak did not call any witnesses.

{¶ 14} After deliberations, the jury found Ptak guilty of menacing by stalking but not guilty of telecommunications harassment. The trial court referred Ptak for a presentence investigation report.

{¶ 15} At the sentencing hearing in November 2019, the trial court sentenced Ptak to 180 days in jail, suspended 160 of them on the condition of five years of community control sanctions, imposed a $500 fine, and assessed court costs

against Ptak. The trial court ordered that Ptak not contact C.W. and that he obtain a mental health evaluation and comply with any recommendations. Ptak's counsel asked that the trial court stay execution of the sentence pending an appeal, and the trial court denied the request.

{¶ 16} Ptak timely appeals from the sentencing judgment. We will address his assignments of error out of order for ease of discussion.

## II. Admission of Cell Phone Records

{¶ 17} In his second assignment of error, Ptak argues that he was denied his right to a fair trial because the trial court improperly admitted cell phone records without sufficient authentication. Ptak contends that (1) the records are not business records pursuant to Evid.R. 803(6), (2) Detective Capwill did not identify an affidavit from the records custodian from either cell phone provider, (3) C.W. could not authenticate the records because she could not identify Ptak as the caller, and (4) Chagrin Falls did not elicit testimony from a records custodian.

{¶ 18} We review a trial court's decision to admit evidence for abuse of discretion. *O'Toole v. Hamman*, 8th Dist. Cuyahoga No. 109193, 2020-Ohio-4753, ¶ 28. An abuse of discretion occurs when the trial court's attitude is unreasonable, arbitrary, or unconscionable. *Marketing Assocs. v. Gottlieb*, 8th Dist. Cuyahoga No. 92292, 2010-Ohio-59, ¶ 47.

{¶ 19} Evid.R. 901(A) governs the authentication of evidence. "The threshold for admission is quite low, as the proponent need only submit 'evidence sufficient to support a finding that the matter in question is what its proponent

claims.'" *State v. Williams*, 8th Dist. Cuyahoga No. 106563, 2018-Ohio-4612, ¶ 26, quoting Evid.R. 901(A). The party trying to admit the evidence may show authenticity through direct or circumstantial evidence. *Id.*

{¶ 20} We find that the trial court did not abuse its discretion in admitting the AT&T records regarding Ptak's cell phone. In *State v. Richardson*, 2016-Ohio-8081, 75 N.E.3d 831 (2d Dist.), the Second District held that the trial court did not abuse its discretion when it admitted bank records in part because the state presented sufficient evidence to authenticate the records. A Department of Agriculture agent testified that he had requested the bank records pursuant to a subpoena. *Id.* at ¶ 41. Attached to the records that the agent received was a letter from one of the bank's document review specialists that certified that the records were true and correct copies of the originals. *Id.* at ¶ 40-41. The Second District found that the subpoena issued by the agent in his official capacity and the certified letter "provide the bank records with sufficient indicia of reliability that the documents are in fact what they purport to be." *Id.* at ¶ 45.

{¶ 21} Likewise, here, Detective Capwill testified that he obtained the records of Ptak's cell phone through a court-ordered subpoena to AT&T, and that the records were accompanied by a certification of authenticity from an AT&T custodian.[1] The certification itself was admitted into evidence and titled, "Certificate

---

[1] The record does not contain a certification for C.W.'s phone records from Verizon, but Detective Capwill testified that the AT&T and Verizon records were consistent with each other, and Ptak's phone records from AT&T alone are sufficient to show when Ptak and C.W. called each other in 2018.

of Authenticity of Domestic Records Pursuant to Federal Rules of Evidence 902(11) and 902(13)." It is signed by an AT&T legal compliance analyst and states that the records are "true duplicates of the original records[.]" It was therefore unnecessary for C.W. to also authenticate the records or for Chagrin Falls to elicit testimony from a records custodian.

{¶ 22} Accordingly, we overrule Ptak's second assignment of error.

## III. Ineffective Assistance of Counsel

{¶ 23} In his third assignment of error, Ptak argues that his counsel was ineffective for failing to object to hearsay testimony from C.W. and Sergeant Fischer that the car following C.W. in February 2019 was registered to Ptak's mother.

{¶ 24} The defendant carries the burden of establishing a claim of ineffective assistance of counsel on appeal. *State v. Corrothers*, 8th Dist. Cuyahoga No. 72064, 1998 Ohio App. LEXIS 491, 19 (Feb. 12, 1998). To gain reversal on a claim of ineffective assistance of counsel, a defendant must show that (1) his or her "counsel's performance was deficient," and (2) "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The first prong of the *Strickland* test requires the defendant to show "that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. *Strickland*'s second prong requires the defendant to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

{¶ 25} "'Hearsay' is a statement, other than one made by the declarant while testifying at trial or hearing, offered into evidence to prove the truth of the matter asserted." Evid.R. 801(C). Generally, hearsay testimony is inadmissible unless the testimony falls within one of the recognized exceptions to the hearsay rule. Evid.R. 802.

{¶ 26} The Eighth District has consistently found that LEADS reports are admissible under the public records exception to the hearsay rule, Evid.R. 803(8)(a). *State v. Schentur*, 8th Dist. Cuyahoga No. 108448, 2020-Ohio-1603, ¶ 29 ("This court has consistently held that a LEADS report is admissible when properly authenticated, pursuant to Evid.R. 803(8) and 901."). *Cleveland v. Craig*, 8th Dist. Cuyahoga No. 99619, 2013-Ohio-5742, ¶ 37 ("[T]his court has repeatedly found that a LEADS printout is admissible as a public record under Evid.R. 803(8)(a)."). "A police officer's testimony is sufficient to show authenticity of a LEADS printout under Evid.R. 901." *Schentur* at ¶ 31; *see also Craig* at ¶ 37; *State v. Papusha*, 12th Dist. Preble No. CA2006-11-025, 2007-Ohio-3966, ¶ 9.

{¶ 27} Here, Chagrin Falls submitted into evidence the LEADS report identifying Kathleen Ptak as the owner of the car that followed C.W. in February 2019. Sergeant Fischer identified the LEADS report, testified that he entered the license plate through the LEADS system, and the LEADS report identified the owner of the vehicle as Kathleen Ptak. The LEADS report is therefore admissible under the public records exception to the hearsay rule, and Sergeant Fischer's testimony is sufficient to establish the report's authenticity. Therefore, the evidence that

Kathleen Ptak owned the vehicle that was following C.W. was properly before the jury via the LEADS report and Sergeant Fischer's testimony.

{¶ 28} Ptak relies on *State v. Garrett*, 8th Dist. Cuyahoga Nos. 87112 and 87123, 2006-Ohio-6020, in which this court found that a police officer's testimony based on his recollection of a mobile data computer was inadmissible hearsay. In *Garrett*, the computer data information itself was not introduced into the record. *Id.* at ¶ 13. But here, the LEADS report was submitted as an exhibit. Even though C.W.'s testimony about what the police told her may have been hearsay, the evidence of the identity of the vehicle owner was properly admitted through the LEADS report and Sergeant Fischer's testimony. Any deficiency in Ptak's counsel's failure to object to C.W.'s testimony would not have prejudiced Ptak's defense. Accordingly, Ptak is unable to show that his counsel was ineffective.

{¶ 29} We therefore overrule Ptak's third assignment of error.

## IV. Sufficiency of the Evidence

{¶ 30} In his first assignment of error, Ptak argues that his conviction for menacing by stalking is not supported by sufficient evidence. Ptak contends that Chagrin Falls failed to present evidence that (1) he engaged in a pattern of conduct, (2) he knowingly caused C.W. to believe that he would cause her physical harm, and (3) that C.W. suffered mental distress. Ptak argues there is insufficient evidence of a pattern of conduct because Chagrin Falls did now show that he was the person who called and texted C.W. and followed her by car to her apartment and Panera Bread. He maintains that Chagrin Falls did not submit any text messages into evidence or

produce any evidence about the duration of the phone calls. He also claims that he never threatened to physically harm C.W., and any annoyance C.W. felt does not rise to the level of mental distress.

{¶ 31} Crim.R. 29(A) provides for an acquittal "if the evidence is insufficient to sustain a conviction of such offense or offenses." A sufficiency challenge essentially argues that the evidence presented was inadequate to support the jury verdict as a matter of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "'The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Getsy*, 84 Ohio St.3d 180, 193, 702 N.E.2d 866 (1998), quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). "[A] conviction based on legally insufficient evidence constitutes a denial of due process." *Thompkins* at 386. When reviewing a sufficiency-of-the-evidence claim, we review the evidence in a light most favorable to the prosecution. *State v. Hill*, 75 Ohio St.3d 195, 205, 661 N.E.2d 1068 (1996).

{¶ 32} Both direct and circumstantial evidence may support a conviction. *Brook Park v. Gannon*, 2019-Ohio-2224, 137 N.E.3d 701, ¶ 24 (8th Dist.). "Although there are obvious differences between direct and circumstantial evidence, those differences are irrelevant to the probative value of the evidence — circumstantial evidence carries the same weight as direct evidence." *State v. Cassano*, 8th Dist. Cuyahoga No. 97228, 2012-Ohio-4047, ¶ 13. "Since

circumstantial evidence and direct evidence are indistinguishable so far as the jury's fact-finding function is concerned, all that is required of the jury is that it weigh all of the evidence, direct and circumstantial, against the standard of proof beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 272, 574 N.E.2d 492 (1991). "'Circumstantial evidence is not only sufficient, but may also be more certain, satisfying, and persuasive than direct evidence.'" *State v. Hawthorne*, 8th Dist. Cuyahoga No. 96496, 2011-Ohio-6078, ¶ 9, quoting *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960).

{¶ 33} R.C. 2903.211(A)(1) states:

No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or a family or household member of the other person or cause mental distress to the other person or a family or household member of the other person.

{¶ 34} R.C. 2903.211(D)(1) defines a pattern of conduct as two or more actions or incidents closely related in time. "The incidents need not occur within any specific temporal period." *Rufener v. Hutson*, 8th Dist. Cuyahoga No. 97635, 2012-Ohio-5061, ¶ 16. "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). "A person has knowledge of circumstances when he is aware that such circumstances probably exist." *Id.* It does not matter whether the defendant "intended that his actions cause fear of physical harm or mental distress[;] instead[,] what is important is [whether] he knew his actions would

probably result in such fear and mental distress." *Vega v. Tomas*, 8th Dist. Cuyahoga No. 104647, 2017-Ohio-298, ¶ 15, citing R.C. 2901.22(B).

{¶ 35} R.C. 2903.211(D)(2) defines mental distress as "any mental illness or condition that involves some temporary substantial incapacity" or "any mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services, whether or not the person requested or received" such treatment or services. "'Incapacity is substantial if it has a significant impact upon the victim's daily life.'" *M.D. v. M.D.*, 2018-Ohio-4218, 121 N.E.3d 819, ¶ 99 (8th Dist.), quoting *State v. Horsley*, 10th Dist. Franklin No. 05AP-350, 2006-Ohio-1208, ¶ 48. "Mental distress need not be incapacitating or debilitating * * * [, and] expert testimony is not required to find mental distress." *Perry v. Joseph*, 10th Dist. Franklin Nos. 07AP-359, 07AP-360 and 07AP-361, 2008-Ohio-1107, ¶ 8. "Evidence of changed routine can support a finding of mental distress." *Morton v. Pyles*, 7th Dist. Mahoning No. 11 MA 124, 2012-Ohio-5343, ¶ 15. So can evidence that the complainant involved the police. *State v. Calliens*, 8th Dist. Cuyahoga No. 109005, 2020-Ohio-4064, ¶ 48.

{¶ 36} After reviewing the record, we find there was sufficient evidence for the jury to find that Ptak knowingly engaged in a pattern of conduct that caused C.W. mental distress. Threats of physical harm are not necessary to sustain a conviction for menacing by stalking. R.C. 2903.211(A)(1). C.W. went to the police on four separate occasions to try to force Ptak to stop contacting her: (1) in 2016 when Ptak continued to contact her after she told him to stop; (2) in May 2018 when Ptak

threatened her mother's puppy and he would not stop sending her text messages, (3) in August 2018 when Ptak left a love letter and roses on her car outside of her apartment even though she had not told him where she lived; and (4) in February 2019 when someone she suspected to be Ptak was following her in a car that was confirmed to belong to Ptak's mother.

{¶ 37} There is sufficient evidence in the record to identify Ptak as the person who engaged in this pattern of conduct. Even though Chagrin Falls did not submit any text messages into evidence, C.W. testified that she knew the text messages were from Ptak because they referred to her by names that only Ptak called her. Ptak did not deny sending C.W. a text message about the pictures she gave him when she confronted him. The love letter left on C.W.'s car with the roses on August 27, 2018, was signed by Ptak, and the phone records show that Ptak's cell phone called C.W.'s twice on that day. Furthermore, the LEADS report shows that the car that was following C.W. in February 2019 belonged to Ptak's mother, and C.W. testified that the driver of the car was male. Ptak is correct that Chagrin Falls did not present direct evidence that he was the person sending the text messages, that he was the one using his cell phone to call C.W., or that he was the male driving the car. But viewing the circumstantial evidence in the light most favorable to Chagrin Falls, any rational jury could have found beyond a reasonable doubt that Ptak was the one who engaged in this pattern of conduct.

{¶ 38} As to mental distress, there is conflict among the Ohio Appellate Districts regarding whether R.C. 2903.211(A)(1) requires the prosecution to show

that the person actually suffered mental distress or merely that the person believes that the defendant will cause him or her mental distress. *Fondessy v. Simon*, 142 Ohio St.3d 147, 2014-Ohio-4638, 28 N.E.3d 1202, ¶ 17 (Kennedy, J., dissenting) ("A conflict exists among the appellate districts regarding whether R.C. 2903.211(A)(1) requires that the victim actually experienced mental distress or whether the victim's belief that the stalker will cause him or her mental distress is sufficient."); *State v. Rasawehr*, 3d Dist. Mercer No. 10-19-15, 2020-Ohio-429, ¶ 22, fn. 4 (recognizing the conflict). There is also a lack of clarity within the Eighth District on this issue. *Compare State v. Beckwith*, 2017-Ohio-4298, 82 N.E.3d 1198, ¶ 14 (8th Dist.) ("[F]or a conviction of menacing by stalking, the statute does not require that the victim actually suffered mental distress."), *with Williams v. Flannery*, 8th Dist. Cuyahoga No. 101880, 2015-Ohio-2040, ¶ 9 (requiring a showing of mental distress). However, the distinction here makes no difference because we find that viewing the evidence in the light most favorable to C.W., Chagrin Falls presented sufficient evidence both that Ptak knowingly caused C.W. to believe that she would suffer mental distress and that C.W. actually suffered mental distress.

{¶ 39} Chagrin Falls presented sufficient evidence that Ptak knew that he was causing C.W. to believe that she would suffer mental distress. In 2017, both C.W.'s boyfriend and her housing manager contacted Ptak to tell him to stop calling and sending C.W. text messages. In March 2018, C.W. called and texted Ptak very upset in response to his message about "the pictures." In May 2018, C.W. sent Ptak a letter via certified mail warning him that she would contact the police if he were to

contact her again. C.W. went to the police on four separate occasions, and the police told Ptak to stop contacting her. This evidence is sufficient to show that Ptak was aware that his conduct was causing C.W. to believe that she would suffer mental distress. *See State v. Erker*, 2019-Ohio-3185, 141 N.E.3d 543, ¶ 81 (8th Dist.) (finding defendant knowingly caused the victim to believe that she would suffer mental distress because she "called the police numerous times, and the police spoke with [the defendant] on more than one occasion about not contacting" her).

{¶ 40} The evidence that C.W. went to the police four times also shows that Ptak actually caused C.W. mental distress. *Calliens*, 8th Dist. Cuyahoga No. 109005, 2020-Ohio-4064, at ¶ 48 ("[T]he fact that [the victim] was involving the police in the first-place evidences mental distress."). Chagrin Falls also demonstrated mental distress with evidence that C.W. changed her routine by switching cars with her mother for a few weeks so that Ptak could not follow her. *See R.S. v. J.W.*, 9th Dist. Summit No. 28970, 2018-Ohio-5316, ¶ 25 (finding sufficient evidence of mental distress where the victim started using a different vehicle, changed her route to work, parked in a garage so her vehicle was out of sight, and refrained from placing window decals on the vehicle that would make it recognizable as hers); *State v. Williams*, 8th Dist. Cuyahoga No. 107133, 2019-Ohio-2323, ¶ 24 (mail carrier's act of working her route out of order to prevent her former boyfriend from following her was evidence of mental distress). Ptak points out that C.W. told Sergeant Fischer that she did not think Ptak would physically harm her, but C.W. also told Sergeant Fischer that Ptak's conduct "freaked [her] out." C.W. testified that it was

"frightening" to her that this "strange man" was contacting her and figured out where she lived. She said that she did not "know him anymore" and that she did not "know what he's capable of."

{¶ 41} Ptak cites *State v. Beckwith*, 8th Dist. Cuyahoga No. 98497, 2013-Ohio-492, to argue that evidence that someone is uncomfortable or "creeped out" is insufficient to establish mental distress. He also relies on *Cleveland Hts. v. Lewis*, 8th Dist. Cuyahoga No. 79511, 2002-Ohio-2736, for the proposition that evidence that someone is upset, worried, or fearful about "not being able to go where she wants" is insufficient to show mental distress. In *Beckwith,* this court found there was insufficient evidence of mental distress where a library employee was uncomfortable and "creeped out" because the defendant followed her around the library and to a hotel entrance where she noticed he had his cell phone pointed at her behind, but he did not call her, and he spoke to her only twice to help him find a book and download a song. *Id.* at ¶ 17. In *Lewis*, this court found insufficient evidence of mental distress where the defendant excessively called his ex-wife one night, and the ex-wife testified that she was worried for her teenage children who were staying with the defendant and was concerned that her children would not be able to go "where they needed to go." *Id.* at ¶ 17-24.

{¶ 42} However, after reviewing the evidence presented, Ptak's conduct and C.W.'s distress in this case is more extreme than the facts in *Beckwith* and *Lewis*. The evidence in this case is more akin to *J.W. v. D.W.*, 10th Dist. Franklin No. 19AP-52, 2019-Ohio-4018. In *J.W.*, the Tenth District found sufficient evidence to support

menacing by stalking where over the course of years, the offender "repeatedly contacted [the victim] by phone, email, and appearing at his house." *Id.* at ¶ 51. The victim and his wife made changes "in their daily lives to attempt to avoid her," and the victim's wife experienced stress and anxiety that affected her recovery from a surgery. *Id.* In contrast to *Beckwith* and *Lewis*, and more like *J.W.*, Ptak continued to contact C.W. over the course of multiple years despite C.W., her boyfriend, her housing manager, and the police repeatedly telling him to stop. Ptak's messages caused C.W. to send him a letter via certified mail and to contact the police. Ptak discovered where C.W. lived without her telling him, causing C.W. to switch cars with her mother to avoid him. And Ptak followed C.W. by car even after these charges were processed against him and a no-contact order was in place, causing her enough stress and anxiety to again reach out to the police.

{¶ 43} Viewing the evidence in the light most favorable to Chagrin Falls, we find that Chagrin Falls presented sufficient evidence to support a conviction for menacing by stalking. Accordingly, we overrule Ptak's first assignment of error.

## V. Manifest Weight of the Evidence

{¶ 44} In his fifth assignment of error, Ptak argues that his conviction for menacing by stalking was against the manifest weight of the evidence. He again contends that he never threatened C.W., C.W. never felt physically threatened or suffered physical harm, and any inconvenience C.W. felt did not rise to the level of mental distress. He further maintains that C.W. moved on with her life by attending

college, there was no evidence that Ptak sent C.W. text messages, and that C.W. did not testify that she received the 55 phone calls in 2018.

{¶ 45} Unlike sufficiency of the evidence, a challenge to the manifest weight of the evidence attacks the credibility of the evidence presented. *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. Because it is a broader review, a reviewing court may determine that a judgment of a trial court is sustained by sufficient evidence, but nevertheless conclude that the judgment is against the weight of the evidence. *Id.*

{¶ 46} In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as a "thirteenth juror." *Id.* In doing so, it must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine "'whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*, quoting *Martin*.

{¶ 47} We agree with Ptak that there is no evidence that he physically harmed or threatened C.W., but to establish menacing by stalking, physical harm is not necessary if the defendant's pattern of conduct knowingly caused someone to

suffer mental distress. Ptak insists that the weight of the evidence shows that he did not cause C.W. mental distress, but we disagree. Ptak's conduct went on for years, and C.W. went to the police on four separate occasions to try to force Ptak to stop. Although she did continue to "move on with her life," she was "frighten[ed]" that Ptak figured out where she lived and was "scared" at the possibility that he was following her — a possibility that was later confirmed when he followed her by car after the charges against Ptak were processed and a no-contact order was in place. She said that she did not "know what he was capable of," and she changed her routine by switching cars with her mother for a few weeks to try to prevent Ptak from following her. We find that there was credible evidence that Ptak's conduct significantly impacted C.W.'s daily life.

{¶ 48} Despite Ptak's contention that there is not credible evidence that he texted C.W., C.W. herself testified that she received an excessive amount of text messages. We find C.W.'s testimony to be credible. She explained that she knew the texts were from Ptak because they referred to her by names that only Ptak called her, they referred to photos that she had sent Ptak, they contained messages about wanting to be with her, they temporarily stopped when Ptak was told to stop contacting her, and she did not know anyone else who could have been sending them. We agree with Ptak that his 55 phone calls to C.W. could not have contributed to C.W.'s mental distress if she had blocked his phone number and was not receiving the calls. However, there is no evidence that Ptak knew his calls were not going

through, and the record of the calls is circumstantial evidence that Ptak was also the person sending her the text messages to which she testified.

{¶ 49} After reviewing the entire record and weighing the evidence and all reasonable inferences, we find that the jury did not clearly lose its way and create such a manifest miscarriage of justice that Ptak's menacing by stalking conviction must be reversed and a new trial ordered. This is simply not the exceptional case where the evidence weighs heavily against the conviction.

{¶ 50} Accordingly, we overrule Ptak's fifth assignment of error.

## VI. Prosecutorial Misconduct

{¶ 51} In his fourth assignment of error, Ptak argues that Chagrin Falls' counsel committed prosecutorial misconduct by engaging in "inappropriate, irrelevant, and immaterial comments" in his closing argument. Specifically, Ptak points to comments when Chagrin Falls' counsel (1) called C.W.'s testimony "overly honest," (2) referred to what Ptak's conduct "did to" C.W., (3) claimed that the Chagrin Falls Police Department "protect[ed] and serve[d]," (4) shifted the burden of proof to Ptak by arguing that Ptak did not present any evidence, (5) impermissibly commented that he had been waking up at 4:00 a.m. to prepare for trial, and (6) asked the jury to give C.W. her life back by comparing her to a victim of child abuse or murder.

{¶ 52} Our review of the record shows Ptak failed to object to all but one of the prosecutor's comments, and thus, he waived all but plain error as to those comments. *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263,

¶ 169. Under Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." The plain-error rule is to be invoked only under exceptional circumstances to avoid a manifest miscarriage of justice. *State v. Long*, 53 Ohio St.2d 91, 97, 372 N.E.2d 804 (1987). Plain error does not occur unless, but for the error, the outcome of the trial clearly would have been different. *Id.*

{¶ 53} The test to determine if there was prosecutorial misconduct during closing arguments is whether the remarks were improper and if so, whether they prejudicially affected the defendant's substantial rights. *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). We must review the entire record to determine whether the disputed remarks were unfairly prejudicial. *State v. Moritz*, 63 Ohio St.2d 150, 157, 407 N.E.2d 1268 (1980). The touchstone of our analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). Furthermore, an appellant must show that there is a reasonable probability that, but for the prosecutor's misconduct, the result of the proceeding would have been different. *State v. Loza*, 71 Ohio St.3d 61, 78-79, 641 N.E.2d 1082 (1994).

{¶ 54} Although the prosecution is entitled to considerable latitude in opening and closing arguments, it must nevertheless avoid assertions that are calculated to mislead a jury. *Smith* at 14. It is improper for the prosecution to express its personal belief or opinion as to the guilt or credibility of a witness. *Id.* However, the prosecution is permitted to fairly comment on the credibility of

witnesses based on the witnesses' testimony at trial. *State v. Williams*, 8th Dist. Cuyahoga No. 90739, 2012-Ohio-1741, ¶ 12. "A prosecutor has wide latitude to comment on the evidence of record, and may suggest conclusions based on that evidence in a closing argument." *State v. Ceron*, 8th Dist. Cuyahoga No. 99388, 2013-Ohio-5241, ¶ 111. Prosecutors may comment in closing argument regarding "'what the evidence has shown and what reasonable inferences [the prosecutor] believes may be drawn therefrom.'" *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990), quoting *State v. Stephens*, 24 Ohio St.2d 76, 82, 263 N.E.2d 773 (1970).

{¶ 55} Further, a prosecutor may not invade the realm of a jury by alluding to matters outside of the record. *State v. Baker*, 159 Ohio App.3d 462, 2005-Ohio-45, 824 N.E.2d 162, ¶ 19 (2d Dist.). However, "[i]solated comments by a prosecutor are not to be taken out of context and be given their most damaging meaning," and we must review the challenged statements within the context of the entire trial. *State v. Hill*, 75 Ohio St.3d 195, 204, 661 N.E.2d 1068 (1996).

{¶ 56} Although some of the prosecutor's comments were improper, after reviewing the comments within the context of the entire trial, we cannot say that they prejudicially affected Ptak's substantial rights. The prosecutor was permitted to comment on C.W.'s credibility based on her trial testimony, and the prosecutor's comment about C.W. being "overly honest" (immediately followed by a comment that she answered "even the most uncomfortable of questions") was likely referring to C.W.'s willingness to answer questions about her dating history on cross-examination. Likewise, the prosecutor's comment about what Ptak's conduct "did

to" C.W. was based on her trial testimony about the mental distress his conduct caused her. We see nothing improper about the prosecutor's theme of "protect and serve." We do not find that the prosecutor shifted the burden of proof by commenting that Ptak did not present any evidence that he did not receive C.W.'s certified letter and that the post office employee was lying about delivering it. "It is not improper for the prosecution, in closing, to point out the lack of evidence supporting the defense theory of the case." *State v. Jackson*, 8th Dist. Cuyahoga No. 76141, 2000 Ohio App. LEXIS 1741, 31 (Apr. 20, 2000). The prosecutor's comment about what time he woke up to prepare for trial was irrelevant (or as Ptak characterizes it, a "call to sympathy"), and it was improper for the prosecutor to ask the jury to give C.W. her life back by comparing her to a victim of child abuse or murder. However, after reviewing the record, we do not find that Ptak has shown that there is a reasonable probability that, but for the prosecutor's improper comments, the result of the proceeding would have been different.

{¶ 57} We therefore overrule Ptak's fourth assignment of error.

{¶ 58} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, PRESIDING JUDGE

ANITA LASTER MAYS, J., and
KATHLEEN ANN KEOUGH, J., CONCUR